Did I pronounce that right? Good morning, your honors. May it please the court, my name is Gordon Shuffler and I represent the appellants in this matter, the Louisiana Crawfish Producers Association and multiple of its individual commercial fishermen plaintiffs. Our clients, your honors, are all which is the largest freshwater basin and fishery in North America. The import of this case is staggering when you consider the size of this waterway that's in question. The defendants, we've alleged the defendants through various canal activities, either through oil and gas exploration or pipeline activities, have generally created a honeycomb of dams in the Atchafalaya Basin. What was the state law claim you filed this action under that was, I don't know whether it was dismissed or I don't know, I know you didn't succeed on it, what was the state law claim? We had also filed Louisiana negligence law claims as well, your honor, and the reason it was an act of proprietary interest in a thing that they were claiming damages for. Under Louisiana law, a fisherman doesn't own a fish until he catches it. So in that sense, it's similar to like a robin's dry dock type argument. We were saved under maritime law though because of the commercial fisherman's exception to proprietary interest requirements. In short, I don't know if your honors understand how this works, but when a company goes out and digs a canal in the Atchafalaya Basin, they dredge, basically cut their trench with a dredge boat, lay the dirt on the sides of the canal and carry forward. They're required to have a permit to do that? Yes, your honor. Permit to Corps of Engineers? United States Corps of Engineers, yes, your honor, and that's under the Rivers and Harbors Act and the Clean Water Act. Some of the older canals in our case, candidly, they predated Clean Water Act, but the Rivers and Harbors Act was around since the 1800s, and so as with anything, the right to navigation is paramount throughout this whole basement. More importantly though, I would add that when they created these dams, they're called spoil banks, they violated their maritime duty not to obstruct navigation. Okay, let's talk about they because it seems to me like we had a lot of players and then now we're down, as I understand it, to two. So can you talk specifically about, the briefing is all about a lot of they's. Can you talk specifically about the two defendants that we still have here on this appeal and what they allegedly did wrong? The specific they's, not everybody and their brother, just Dow Interstate and Will Brothers. Yes, your honor, we're left with two appellants today because of a recent settlement in the case. Bottom line is, Will Brothers is a contractor, okay, and I have to kind of give a history going back a few decades for you to understand the actions of Will Brothers in 2001. What we've complained about was originally a company came into the basin, dredged a pipeline canal across the basin, and in this instance it's 18 miles of pipeline which crosses this particular area in question. When that company did that decades ago, they were under a court permit. They were not to obstruct navigation with spoil banks. They were to, specifically, they were also to leave gaps in these spoil banks which would have facilitated flow of water through and across the pipeline, and they were also not to create any sort of permanent ridges across the waterway. So, flash forward to 2001, company that Will Brothers is a contractor for, they want to come in and lay a pipeline in the Jaffa Lawyer Basin. They come up with this convenient method of, hey, there's an existing 18 mile corridor right here. Why don't we lay our pipeline? It foregoed all the problems. It's basically a way of doing this without getting their feet wet. Now, what we've alleged is that in doing this, over decades, there were natural sloughs and natural waterways that had opened their way across these existing spoil banks. In order for Will Brothers Company to come in and lay the pipeline, they drove a bulldozer out into the basin and on top of the spoil banks and leveled off the spoil banks. So, any sort of gaps, any sort of natural drains, anything that was there, they filled them in to make a nice, clean, flat working surface. To the extent, and you see in our complaint, they were even driving a school bus across the Jaffa Lawyer Basin, ferrying workers back and forth during the construction project. Several of our clients that live in the vicinity actually worked for Will Brothers or its predecessor, Rogers and Phillips. What they did in closing off these existing gaps that may have been there or were there, that we allege were there, they just basically finished off what the original defendant started. Now, when I say that we're talking about gaps in these spoil banks, these are gaps that are big enough for our clients to run boats through, for massive quantities of water to run through and feed the estuary. When Will Brothers came through and did what it did, it basically finished off the work that its predecessor had started. And so, what we're faced with today is the question, you know, the lower court decided... I apologize, I'm getting ahead of myself. Dow, Your Honor, we've alleged that Dow Interstate Gas is the successor to Dow Chemical. And candidly, this wasn't pled in the complaint, but discovery was ongoing at the time. Dow Interstate Gas basically is the successor to Dow Chemical. It's my understanding Dow Chemical built the pipeline, Dow Interstate now owns, maintains it sort of like as a subsidiary company of Dow Chemical. On top of all that, recently Dow Interstate had come in and put cement mats where areas where the pipeline had washed out, they came in and placed cement mats, which we allege are also an obstruction to navigation and potentially a hazard to navigation for our clients. Particularly when you consider where the mats were placed. The mats were placed where areas where nature had taken its course on the Dow Pipeline's spoil banks, which were illegal in the first place. In what way do you differ from the district court's finding that this activity constituted pipeline construction and repair? It's our position, Your Honor, that basically the lower court did what Grubart warned the courts not to do. It hypergeneralized. And it referred to the activities, particularly at Wilbro's, strictly as pipeline construction and repair. Now, if the lower court could have easily done the same thing to the other companies that remain defendants at the lower court today, the only reason they're still in the case is because they did their work from dredge vessels. We believe that we're not talking about just pipeline construction and repair. Had the court said that about the other companies as well, they would all be here on appeal. But the lower court found and it described the activities of those companies as pipeline construction and repair done from vessels. In this case, though, we believe the lower court hypergeneralized because the real what we would submit is the real issue here. The activity we complained of is not the pipeline construction itself. We're hypergeneralizing by saying any activity that affects the waterway becomes a traditional maritime activity. I mean, your argument is that they're affecting the waterway, even though what they're doing is not particularly maritime. You can run a pipeline anywhere. But because of the way they're doing it, you're saying it's affecting the waterway. So is that the test that you want us to apply, that anything that affects a waterway is a traditional maritime activity? It's not so much that it affects the waterway. We're alleging, and our problem was that it was actually done in the waterway. You know, the court... But then you're getting rid of the traditional. I mean, then you're saying anything that's around a waterway or something that used to be a waterway is enough. But I thought there's this additional concept of whether it's traditional in a waterway or in something that used to be a waterway, that's good enough. Isn't that conflating the two problems? I respectfully don't believe so, Your Honor. Why not? The reason is that if you look at... We're not asking the court to make any leap of faith here. If you look at the history of jurisprudence, you know, maritime telefactors under the old strictly locality test, or even today, there's cases across the board that says when a land actor crosses a navigable waterway, he's going to naturally be subject to the rules of admiralty and jurisdiction. I mean, we cited a plethora of cases, you know, bridges that cross waterways found to be liable in admiralty when they have boats passing through, jetties that are unlit, unlit caissons, unlit offshore platforms. This is all stuff that's when you get down to it, yeah, there's no maritime concern when you're building a platform or when you're building a bridge or anything like that. But when it affects or obstructs navigation, then absolutely the rules of admiralty come into play. And in this case, we're alleging that these companies put dirt in the way of navigation and water flows for our folks. You know, the group board analysis, when it talks about this second prong of the nexus test, it basically says that look, you can't ignore the maritime character of the activity giving rise to the incident. You know, the second prong being the activity giving rise to the incident has to have a substantial relationship to traditional maritime activity. But group board warns us that you can't just forego any of the maritime character of the activity. You can't forego what? I'm sorry, I missed that. The maritime character of the activity. And I'll give you all a prime example. The 17th Street Canal case here, the N. Ray Katrina Canal breaches case. In that case, the court found that there was no maritime jurisdiction. That involved the claims of New Orleans residents that were suing these various contractors. But basically, the court found that they described the activity there as dredge boats dredging, but then it had to throw in the last caveat, in a drainage ditch. You know, there has to be a tie to the actual maritime character of the situation. And that's why we find it important, you know, we would define the character of the activity giving rise to this incident as construction activity which led to spoil placed in navigable waters. When you look at it that way, all the questions, all the concerns, the reason we have admiralty courts is to address admiralty concerns. And when you put an impediment to navigation in the way, you subject yourself to admiralty jurisdiction. That's our position, your honors. I would like to close with one last point. You know, the Grubart analysis, I'm going to read from the case at 539 to 540. When talking about the second prong, they ask, we ask whether a tortfeasor's activity, commercial or non-commercial, on navigable waters is so closely related to activity traditionally subject to admiralty law that the reasons for applying special admiralty rules would apply in the suited hand. In this case, you're running dirt in the way of vessels and navigation. The right navigation is paramount in this country. You look at the old cases, I believe it was one of the cases we cited, the cord, they referred to bridges as something that the maritime law tolerated. Is there a remedy under a federal statute through the Corps of Engineers to have the openings recreated or some other remedy? There is no personal right or remedy that a person, that an individual has under the Rivers and Harbors Act. That's strictly the rule of the Corps of Engineers on that matter. But you could petition the Corps of Engineers to take some action? Potentially. And our clients, candidly, your honor, they tried everything they could with the Corps before they came to us. I'll see that my time is up. Yes, you've saved time for rebuttal. Thank you. Yes, sir. Thank you. Mr. Vietor. Your honor, may it please the court, John Vietor on behalf of Dow Interstate Gas. And I'll refer to my client as Dow Interstate to not confuse with Dow Chemical, which is currently a defendant in the district court case, which is not on appeal. Okay, so the allegation against your client is that you're a successor to Dow Chemical? Well, I believe that was the allegation that's been argued in the briefs. But if you look at the actual petition and complaint, paragraph 194, as it relates to successor liability, and I believe that just was conceded, it has not been sufficiently pled. All they say is that Dow Chemical was the predecessor to Dow Interstate Gas. There are no allegations that go with this. Let me see if I can come at it more crisply. Is there any allegation that Dow Interstate Gas did anything other than be the successor to Dow Chemical? There are. There's paragraph 244, which addresses the mats, the concrete mats that were alleged to be placed along exposed pipelines that they claim impede navigation, impede flow. They don't say it obstructs navigation. They don't allege a collision, an elision. They don't allege they've had to spend more gas going around it. Those are the only allegations in paragraph 244 regarding Dow Interstate Gas and their placement of mats, which the district court properly defined as repair of a pipeline. And we would also argue that the courts have to understand that this is not the first complaint. The original complaint was filed in 2004. This is now the fifth amended complaint, filed only after there was briefing and argument of other motions where instead of dismissing the complaint, the district court allowed the complaint to be amended to allege allegations. And while there has been discovery since the amended complaint, there were sufficient allegations to the extent they wanted to amend it, they could have amended it during this entire process. But as we sit here today, the court has to look at only the allegations on a 12B6 analysis under Iqbal Twombly, only the factual allegations, not the conclusions of law. Let me just get clear in my head. Is Dow Chemical still pending in the district court as a dredger? Yes, Your Honor. It's a dredger. So Dow Interstate Gas is liable under successor liability. I know you think they're not. But if they are, then it is dredger liability. We're not in this other thing that we've been talking about with Wills Brothers. That would be correct. Under the court's analysis, they defined Dow as the company they allege that Dow Chemical is the company who dredged the pipeline. And I think it's important to note that with regards to Dow Interstate Gas, there are no allegations of Spalbank. We've heard a lot of discussion. The petition and the briefs are replete with the impacts that Spalbank have had on navigable water. There's no allegations against Dow Interstate Gas that we have deposited Spalbanks, we have altered Spalbanks, we've done anything with the dirt. What they're talking about is placing concrete mats over pipeline that sink down into the mud. And there's been no allegations. Their allegation seems to be that there were gaps in these Spalbanks before and now there aren't because of this pipeline. Was your company alleged to be part of messing that up, just for one of a more of the complaint. Which regarding Dow Interstate Gas, it says mats were placed in areas where natural drain had eroded away the spoil on top of the pipe. These washouts also function as natural drains, in some cases function as avenues for commercial navigation. These mats pose a hazard to commercial navigation and thus impede and discourage same and further impede water flows and through the pipeline. That is the extent of the allegations against Dow Interstate Gas. Natural drains, they don't say we obstructed a navigable body of water which completely eliminated access or completely eliminated the ability for the plaintiffs to get around. As your Honor is aware, there are plenty of objects in navigable bodies of water which may impede navigation. The pylons on a bridge, as long as they're properly marked, they may impede navigation as long as you can go through the channel, go around the pipeline. It's not a cause of action for So to be clear, you believe that Wills Brothers could lose and you could still win this appeal. No, Your Honor. I think that properly the court defined both as construction. I know that y'all are co-defendants, you're not trying to throw them under the bus. Our facts are unique. Is there a difference between you two? I think the facts are unique. And particularly I believe with regards to the Wills Brothers, they don't allege any vessels at all. Did Dow Interstate place the mats or did Dow Chemical? Dow Interstate is alleged to have placed the mats and that's factually who placed the mats. If Dow Interstate placed the mats and that is sufficient for impeding maritime law, then the successor liability we don't need to worry about. Successor liability we don't need to worry about because they haven't pled it. But I would argue that what the plaintiffs have alleged here is such a unique circumstance that there's never been a maritime jurisdiction case where they found maritime jurisdiction other than the district court. We're dealing with multiple defendants over decades. You brought up jurisdiction and that's what I want you to answer in your remaining time. Why isn't this more a Rule 12b-1 jurisdiction issue than 12b-6 failure to state a claim? Like the chicken or the egg. And I think the difficulty is the catch-22 we're caught in, Your Honor, with the fact that there are no state law claims. There's supplemental jurisdiction in the district court over the claims against DIGC, Dow Interstate, and there are no state law claims. So our position is we're asserting that they haven't alleged a maritime tort as it relates to us. Therefore, there are no claims to survive. But to allege a maritime tort, don't you have to have maritime jurisdiction? The test is the same, but just because you have jurisdiction doesn't mean you have. I understand that, but you've got to have jurisdiction first. We can't just assume that and the parties can't agree not to raise it. In the jurisdiction in the underlying court, the district court found there was supplemental jurisdiction against what the judge referred to as the non-dredgers. So against Dow Interstate and Wilbrose. Why did you move under 12b-6 instead of 12b-1? We moved together as a group, and the purpose was to have a factual ruling that there was no maritime tort that they've pledged. We didn't have to go beyond the pleadings in 12b-1. We went according to the pleadings that were before the court in the 5 supplemental amended complaint to assert that they have not, to this day, they have not asserted a maritime tort against Dow Interstate Gas. In all the cases that they rely on, all the cases involving pipelines, they always come back to one essential thing. They all involve the heart of maritime, which is commercial navigation. And that's what the incident and the activity involves, is a vessel colliding or some connection somehow to commercial navigation. And were the court to overturn the district court's ruling as it relates to Dow Interstate and Wilbrose, I think it would expand maritime jurisdiction as we know it. There's never been a similar case like this involving so many different defendants over the entire west side of the basin for decades, from 1940 to present. There's no discrete event. I think to find that there is a maritime tort would essentially be finding that there's maritime jurisdiction over the claims against our client, which we say there is not. Thank you. Mr. Guy. Good morning, Your Honors. My name is Matthew Guy. I appear on behalf of Defendant Wilbrose, RPI, Inc., which is the successor in interest to Rogers and Phillips, who was one to build a pipeline in the Atchafalaya Basin in an existing spoil bank. I think it's fair to say that Wilbrose should not be seen as a bigger player in this litigation than it is simply by virtue of being one of the few men standing at the time of this appeal. It's important to note that both the company for whom Wilbrose was working and the vast majority of the other defendants in this case have settled, and that the position of Wilbrose shouldn't be magnified by virtue of it still being a live defendant that was dismissed. You're not trying to apportion blame. No. We're just trying to see whether Wilbrose potentially can remain in court to shoulder whatever blame is appropriate. So we will assume that you think they didn't do wrong. The question is, has there been a sufficient allegation of doing wrong to state a maritime tort? Well, that's a fair point, Your Honor, and the answer to that would be no. If you look at the fifth amended petition on this, there are 414 paragraphs in that, over 174 pages. Four of those paragraphs concern Wilbrose and its activities. Can you tell me what those are? Yes. Those paragraphs are 236 to 240. And the important thing to remember about the allegations against Wilbrose in the fifth amended complaint is they're actually different to what's being alleged in the pleadings, in the appellant's brief, and what Mr. Shuffler was explaining was what they complained that Wilbrose had done wrong. And I think it's important to stick to the close textual analysis of what those allegations are. So in paragraph 236, we're told that Wilbrose was permitted to construct a pipeline. In the next paragraph, we're told that they would level a spoil bank, dig a trench, and bury a pipeline in an existing spoil bank. Pausing there, the spoil bank about which they complain, and insofar as the other defendants, most of whom have settled, are concerned, by their own definition is not a navigable waterway. It's land. That's the central part of their complaint. Created improperly, they would say, by defendants acting in the basin long before my clients ever came along to it, but by the time they do come, it's a Telltale giveaway was in Mr. Shuffler's description of the plan that Wilbrose and his client came up with was to put in a pipeline without getting their feet wet, was the expression that he used, which underscores how divorced this is from any maritime activity. Returning back to the complaint, paragraph 239 gets to the central issue that Mr. Vietor was discussing, which is describing Wilbrose activities, and this is the plaintiff's describing them, as pipeline construction activities. Again, the time they're caused is addressed in paragraph 240, which states there that Wilbrose caused numerous natural drains in the spoil bank to become plugged with spoil material. None of those allegations include an allegation that maritime commerce has been interfered with, that a navigable waterway has been blocked or disrupted at all. The last allegation in 240 is that there is a complaint that various of Wilbrose employees, who by shocking coincidence also plaintiffs in the suit, alleged to have told them that they should have reopened natural drains and they didn't do so. Well, even assuming that's true, that's not an allegation that gives rise to a cause of action. So if you look at the totality of the allegations as pled in the Fifth Amendment complaint, and not as summarized in oral argument or in the appellant's brief, we can conclude as follows. There's no allegation that Wilbrose used a vessel. There's no allegation that it was engaged in dredging. There's no allegation that it was there to engage in pipeline construction. And there is a plethora of cases that pipeline construction, even when conducted from a vessel and with the use of divers, is not a traditional maritime activity. Moving on, none of the allegations they make say that there is any activities with the potential to disrupt maritime commerce. And there's no allegation, and this is I think crucial, that these activities disrupted or abstracted a navigable waterway. If you had alleged that, then this would be a different outcome. So you would agree that affecting the waterway is traditional maritime activity? Not necessarily, Your Honor, but I'm sticking within the analysis of the 12B6 approach of looking at what's actually in the amended complaint, where they were told... You're saying you don't have to bite off more than that. Exactly, Your Honor. I'm limited by what's in the complaint. And as Mr. Vierdor pointed out, they've had plenty of opportunities to amend this. And not only with this being the fifth amended complaint, but also being able to do so after substantial discovery has been taken, including the 30B6 deposition of my client. So the point being that if they wanted to make allegations that could perhaps walk into a maritime tort, they should credibly have done so before. They also never sought relief from the district court and have not sought relief from this court that they should be allowed to amend their complaint for a sixth time in the hope that they can get it right. In other words, the fifth and final complaint when instructed by the district court to do that, were told you've got to give it your best shot here. And you've got to give it your best shot within the bounds of what they knew and reasonable inferences. I was just going to say, they have to have a basis, a good faith basis for alleging something. So your point is after all of this rigmarole, if they had a good faith basis to say you obstructed the waterway, they would have said it. And then you deal with whether obstructing the waterway is enough or... Well quite so, but Mr. Shoffler just told me, just told the court in his oral argument that gaps ran through the boats, gaps ran through the spoil bank and that these were plugged up by the activities on the spoil bank, on the land by Wilbur's. Nowhere is that alleged in the petition, in the amended complaint. There's no suggestion in the allegations against Wilbur's that these plaintiffs used to be able to drive their boats through the spoil bank, but as a result of Wilbur's actions, they're no longer able to do so. The best that they come up with on that is that the drains in the spoil bank became plugged with spoil material. That in itself is not a maritime, does not give rise to maritime jurisdiction. It's not a maritime tort. And it arises out of a traditionally non-maritime activity, which is pipeline construction. So do you think they even flunked the situs test? I mean, you're not even on a waterway in these spoil banks? No, by their own definition they don't. And you can see why. Because at the time of drafting the original appeal brief in this, plenty of defendants, including those who were alleged to have constructed the original spoil bank, were still in the game. Well they're not now. So the fact that the spoil bank is land created prior to my clients ever coming on the scene creates a problem for them. In the sense... So you're saying once it is land before you had anything to do with it, it's land? Well that's right, yes. And so the fact that it may have at one point, because I'm interested in this point because we have creeks drying up in Texas and we have people creating land out of water, people creating water out of land, and so at what point do you judge whether something is water? Well again, if we go back to the 12B6 analysis that is germane to this case, and you go through the whole complaint, the allegations against previous defendants acting in the basin long before my guys get there, is that there was a navigable waterway and now there is a the water becomes the land. But one thing I do know is that it's before my clients got there, and in fact that's what's alleged in the complaint, insofar as Wilbur's is concerned. So I have... Why isn't this more a question of jurisdiction than whether or not a tort was stated? I think the answer to that question of why one moved under 12B6 rather than 12B1 is that the magistrate at the district court had already taken the approach of down the 12B6 line of giving the plaintiffs an opportunity to amend their complaint such that it would satisfy 12B6. And the 12B1 approach, which would allow people to look outside the pleadings and so forth, never came to it. I also think it's a different question when you have defendants who are plainly operating vessels and engaged in navigable waterways who probably would satisfy a jurisdictional test for 12B1, but that doesn't apply to non-vessel operating defendants such as my clients. Thank you, Mr. Guy. Mr. Sheffley, you're still time for rebuttal. Yes, Your Honors. I've heard Mr. Guy there refer to this pre-existing spoil bank that his company was conveniently able to use as land, quote land. And he refers to it as it's not navigable waters. This was land before we got there. He conveniently ignores the fact that that land is what we complained about against another defendant. Yeah, but I think that's the question. I mean, if somebody wrongfully causes a creek bed to dry up and now someone else comes and starts working on that creek bed, how far back do we go to say this was a creek bed, even though there hasn't been water in it for years? I understand blaming the original guy who caused the damming or whatever, but this guy who comes on it later doesn't even realize it was a creek bed and starts doing his thing, or whether he realizes it or not. At what point? We have people in this world creating land out of water and water out of land, okay? And so at what point do we judge a defendant's even though it was another before? I would say the point at which Wilbros realized that this was a navigable waterway was when they had to obtain a Corps of Engineers permit to construct the pipeline that they did. The reason they got that permit is because they were in navigable waters, or should have been. Had the original company not done what they were way higher than the waters of the Jaffa Basin ever even reached, you know, then why should they benefit off of the very thing that we're complaining of? The reason they did, they constructed the pipeline the way they did is because it was inexpensive. I guess I'm just interested in what the law's test looks at, not really what somebody might think is fair overall, because the truth is land changes over time. We go back far enough, you know, some other peoples own the land that a lot of us now have our houses on. And so how far back are we going to go in this kind of analysis? I would submit to the court, you know, I'm not wholly prepared to discuss it today, but I'll tell you that the test for navigability is plain and simple. Waterways that are susceptible of maritime commerce. Well, the fact is you can't navigate this spoil bank. I mean, that's what your opponent's saying, and he's saying by the time I got there that was true. It's a mound of dirt, to use your language. So why can't he be judged based on the mound of dirt he found, regardless of whether that mound of dirt got there rightfully or wrongfully? Before he got there, there were gaps. And we've actually pled it in the complaint. There were gaps. Where is your gap complaint against Wills Brothers? Let me see. What paragraph should I look at to rebut what Mr. Guy said? I believe it's, like I said, paragraphs 236 through 240. But we've also, and Your Honor, candidly, I don't have my complaint in front of me, but there was also, what we did was we made the specific allegations against each of the defendants, and afterwards we listed each of our plaintiffs and how they were harmed. And the two plaintiffs that we represent that work for this company, they were familiar with the territory. They saw the gaps that they used in that area for their commercial fishing operations. They saw them get plugged up, and they requested that they be opened after the project was done. So where is your allegation against Wills Brothers that you want to rest on to show that they plugged up a gap, that a boat used to be able to drive through this gap, and Wills Brothers has now made that not possible? Well, the language, it said paragraphs, I believe it's probably at paragraph 240. And the language I'll read to you says, As the project came to a close, Wills Brothers received requests from several of its employees to reopen the natural drains. Upon information relief, Wills Brothers willfully ignored these requests, leaving the natural drains obstructed with spoil in violation of the permit issued. But there's a difference in my mind between a drain and something I can drive my boat through. And so I don't see the drain allegation as showing that I used to be able to drive my boat here, and now because of Wills Brothers, I can't. It's a term of colloquialism to the fishermen in that area. It seems you don't even say they filled those gaps. You're just saying they refused to reopen gaps as if someone else had filled the gaps, and now they weren't willing to reopen them. The allegation was that they filled them when they leveled the spoil bank. Where is, what paragraph is that allegation? It's in paragraphs 236 through 240. Okay, so just to be clear, you're saying drain and gap are the same thing? Yes, Your Honor. And I see my time is up. Thank you. Thank you, Mr. Sheffield. Your case is under submission.